IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

DONTA JENKINS,

                     Plaintiff,

       v.

SALAM SYED, TRISHA ANDERSON,
KRISTINE DEYOUNG, MELISSA THORNE,
DENISE VALERIUS, KERRY NEWBURY,
JAMIE GOHDE, KATHLEEN WHALEN,
NEAVER WALTERS and CANDACE WARNER,

                     Defendants.

OPINION AND ORDER

16-cv-694-bbc

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Pro se plaintiff Donta Jenkins is proceeding on claims that staff at Columbia Correctional Institution denied and delayed treatment for his back and shoulder pain since April 2016, in violation of the Eighth Amendment. (I have amended the caption of the complaint to reflect defendants' full names and the correct spelling of their names). Before the court are (1) defendants' motion for summary judgment, dkt. #44; (2) plaintiff's motion to dismiss defendants' motion for summary judgment because defendants failed to respond to his proposed findings of fact, dkt. #66; and (3) plaintiff's motion to add video and medical images to the record, dkt. #69. For the reasons explained below, I am granting plaintiff's motion to add video and medical images, denying plaintiff's motion to dismiss the summary judgment motion and granting defendants' motion for summary judgment.

# PRELIMINARY MATTERS

## A.  Plaintiff's Motion to Dismiss

In conjunction with his response to defendants' motion for summary judgment, plaintiff filed supplemental proposed findings of fact on July 24, 2018. Dkt. #59.  Although defendants responded to plaintiff's proposed findings of fact, they did not do so by their August 9, 2018 reply deadline.  Rather, defendants filed their response to plaintiff's proposed findings of fact on August 24, 2018, and have explained that they mistakenly calculated the response deadline for 30 days, which would apply had plaintiff filed his proposed findings of fact in support of his own motion for summary judgment.  Plaintiff has moved to dismiss defendants' motion for summary judgment in its entirety, but he has failed to show that he suffered any prejudice as a result of the late filing.  Contrary to plaintiff's contention, his proposed findings of fact do not "clearly prove" that defendants violated his constitutional rights under the Eighth Amendment.  Even if I were to consider plaintiff's proposed findings of fact to be undisputed, they are insufficient to defeat defendants' motion for summary judgment for the reasons explained in the opinion below.  Therefore, I am denying plaintiff's motion to dismiss.

## B.  Plaintiff's Motion to Add Video and Medical Images to the Record

On September 21, 2018, after the briefing was completed on defendants' motion for summary judgment, plaintiff submitted a disc containing hundreds of medical records from the University of Wisconsin Hospital and Clinics, which he seeks to add to the record as

evidence. Dkt. #69, exh. #1. Defendants do not oppose the motion so I will grant it. However, this evidence relates to a more general issue with plaintiff's proposed findings of fact and responses to defendants' proposed findings of fact.

In many cases, plaintiff has cited a large group of medical records in support of a general or conclusory statement that he makes and instructs the court to read the entire document. This practice violates the court's summary judgment procedures, which direct parties that "[e]ach factual proposition must be followed by a reference to evidence supporting the proposed fact. The citation must make it clear where in the record the evidence is located." Pretr. Conf. Ord., dkt. #18, at 17. In addition, the procedures state that "[t]he court will not search the record for factual evidence. Even if there is evidence in the record to support your position on summary judgment, if you do not propose a finding of fact with the proper citation, the court will not consider that evidence when deciding the motion." Id. at 14. Therefore, I have considered plaintiff's proposed findings of fact and responses to defendants' proposed findings of fact only to the extent that they are clearly and obviously supported by his citations to the medical record.

In addition, although plaintiff was granted leave to proceed on a claim that defendants acted with deliberate indifference to his shoulder and back pain beginning in April 2016, he now seeks to introduce evidence related to events and treatment that occurred prior to April 2016. With the exception of a few events that are relevant for background purposes, I have not considered the treatment that defendants may have

provided plaintiff prior to April 2016 because it is not part of the claims on which plaintiff was allowed to proceed.

With these considerations in mind, I find the following facts to be undisputed unless otherwise noted.

## UNDISPUTED FACTS

### A. The Parties

At all times relevant to this case, plaintiff Donta Jenkins was incarcerated at the Columbia Correctional Institution. Plaintiff has a history of back pain and had surgery on October 15, 2014 to repair a labrum tear in his right shoulder.

Defendants all worked at Columbia at some time. Defendant Dr. Salam Syed worked there as a physician from July 14, 2014 to September 30, 2016 and again from February 6, 2017 to the present, except that he did not work at the institution in May 2017. As a physician, he diagnosed and treated inmates' illnesses, arranged for outside consultations, prescribed medication and ordered specialty care as needed.

Defendant Jamie Gohde was the health services unit manager at Columbia from July 25, 2016 to May 15, 2017. Defendant Candace Warner was the interim health services unit manager from April 14 to July 28, 2016, and she mentored the new health services unit manager from March 2017 to May 15, 2017. The health services unit manager is responsible for the management and supervision of health care services, monitoring care plans and nursing practice documentation in medical records, preparing required reports,

responding to inmate health services request forms as time permits and acting as a liaison to other disciplines, institution units and community health care providers. The unit manager does not regularly provide direct patient care to inmates and does not have authority to prescribe medication or override the treatment decisions of the physicians or nurse practitioners. Neither Warner nor Gohde was involved in any decisions made about plaintiff's medical treatment or provided him any direct patient care. Although Gohde received and responded to health services requests written by plaintiff, Warner did not.

The remaining defendants are all registered nurses who were employed in the position of "nurse clinician 2" at various times: Trisha Anderson from September 26, 2011 to January 21, 2018, Kristine DeYoung from June 28, 2015 to September 18, 2016, Kerry Newbury from May 2015 to September 18, 2016, Melissa Thorne from July 18, 2011 to October 27, 2017, Denise Valerius from April 2012 to the present, Neaver Walters from August 8, 2016 to March 4, 2017 and Kathleen Whalen from July 14, 2014 to May 1, 2017. Nurse clinicians work under the supervision of the nursing supervisor and perform the following duties: patient evaluation, assessment and treatment; assisting the physician in providing medical services; managing medications; providing emergency care; maintaining medical records; responding to health services requests submitted by inmates; and scheduling appointments with the physician or advanced practice nurse prescriber as necessary. Nurse clinicians also record medication orders made by the physician or advanced practice nurse prescriber in the patient's medication administration record and notify the central pharmacy to send the medication. They do not have the authority to prescribe medication (other than

what can be obtained "over-the-counter"); do not order specialty treatment, advanced treatment or testing; and cannot alter recommendations for specialty or advanced treatment or testing made by the physician or advanced practice nurse prescribers. Although defendants DeYoung, Valerius and Whalen may have responded to plaintiff's written health services requests or performed other administrative duties with respect to plaintiff's care, none of these defendants provided plaintiff in-person care or treatment.

B. <u>Access to Health Care at Columbia</u>

As mentioned above, inmates at Columbia submit health service request forms to request non-emergency medical attention, inform the health services unit of a specific medical concern or obtain information about their medical care. Nursing staff members triage the requests daily and schedule an inmate for "sick call" if the stated problem requires medical attention. Sick call is held every weekday, but an inmate might not be seen the same day, depending on the type of care needed and staff availability. Nursing staff also respond to inmates' health services requests in writing if possible, providing them a medication information sheet or confirming that they are on the schedule to be seen. If the request is beyond the knowledge of the nurse, it may be forwarded to the health services unit manager. Inmates also may complete and submit an interview and information request about concerns they have, but these forms are generally sent to unit managers or other higher level administrators for response and are not intended to be used to request medical care.

If an inmate has an appointment scheduled with a doctor for an off-site visit or other specialty care, prison rules prohibit the nursing staff from informing the inmate of the precise date or time of that appointment. There is a risk that an inmate might decide to use the appointment time as an opportunity to cause a disruption, inflict harm on someone or attempt an escape from the institution. Institution protocol mandates that a list of off-site appointments is prepared on the evening prior to the appointment and provided to security staff supervisors. Inmates do not learn they have an of-site appointment until security staff arrive at their cell to escort them for the appointment.

Department of Adult Institution Policy 500.10.08 requires inmates to "receive care that is ordered" in a "timely manner" and instructs staff to avoid and eliminate "unreasonable barriers" such as excessive co-payments, punishing inmates for seeking care and having understaffed or poorly organized systems. However, several factors affect the scheduling of procedures such as a cortisone injection, including the overall schedule of the health services unit and any demands on the physician and nursing staff that may take precedence.

### C.  Plaintiff's Treatment

Between April 14, 2016 and May 12, 2017, plaintiff made 95 health service requests to which health services staff responded. (Although plaintiff says that he did not receive a response to all of his requests, he fails to present any evidence in support of his assertion other than copies of health services requests dated June 25, 2016 and August 2, 2016, in

which he generally states that he has not received a response to his past requests.  However, plaintiff's stated concern on those dates was that he had not received treatment in response to his requests, not that staff had failed to make any response to the requests.)  Plaintiff had 49 visits with medical staff during that period; 21 of those visits included assessment, treatment or followup for his complaints of shoulder or back pain and 23 visits related to hunger strike assessments.

1.  April 2016:  plaintiff injures his back and Dr. Syed orders treatment

On April 14, 2016, plaintiff tweaked his back playing basketball during recreation and was seen by defendant Thorne in the health services unit for complaints of sharp pain in his lower back. Thorne offered plaintiff ibuprofen and medicated pain rub and instructed him to alternate ice and a warm compress.  (Plaintiff says that he never received ice or a warm compress, but the only evidence that he cites in support of this assertion is a pain medication log that would not list ice or compresses because they are not medications.  He also has no evidence that any of the defendants were responsible for his not getting the compress or ice.) Thorne believed that this was the recommended course of care because the injury was new within the past week and plaintiff had not yet tried these interventions, which were consistent with the "Musculoskeletal and Pain Nursing Protocols" used within the Department of Corrections.  Thorne instructed plaintiff to notify the health services unit if there was no improvement or if there was an onset of new symptoms.

On April 19, 2016, defendant Newbury saw plaintiff to address his complaints of jaw pain, for which a doctor later prescribed plaintiff a muscle relaxant. (Although progress notes state that Newbury also saw plaintiff for low back pain and that she recommended ice four times daily, plaintiff says that he was not seen or treated for low back pain at this appointment.) Newbury did not personally treat plaintiff regarding his complaints of back and shoulder pain on any other occasion. (Although plaintiff attempts to dispute this by pointing out that Newbury responded in writing to several requests he made about being in pain, he has not presented any evidence that Newbury saw or treated his back or shoulder pain again.)

On April 26, 2016, plaintiff saw defendant Thorne for continuing low back pain and she scheduled him for an appointment with defendant Syed. At his April 28, 2016 appointment with Dr. Syed, plaintiff reported having had back pain for a while and noted that it had worsened in the past three to four weeks. (Plaintiff has submitted no evidence suggesting that he sought treatment for back pain before his basketball injury two weeks before this appointment.) Plaintiff asked for a cortisone injection, which previously had given him relief for his post-surgical right shoulder pain in July or August 2015. Dr. Syed ordered a cortisone injection for plaintiff's right shoulder, referred plaintiff to physical therapy for his low back pain, continued an order for pain-relieving gel and discontinued ibuprofen and Tylenol in favor of prescription strength Naproxen for the inflammation causing pain in plaintiff's shoulder and low back. According to Dr. Syed's declaration:

- Physical therapy can be beneficial in cases such as plaintiff's because increased strength and range of motion can help reduce pain and stiffness.

- Non-steroidal anti-inflammatory drugs like Naproxen were the best choice for plaintiff's condition because they have been shown to be as effective as narcotics in pain relief when given in prescription strength. Prescription strength Naproxen also is highly effective in reducing swelling and relieving joint pain and is more appropriate for chronic pain than narcotics, which are intended for treatment of acute injuries or during recovery after surgery and have more of a potential for abuse or dependency.

2.  <u>May 2016:  plaintiff requests medication, physical therapy and injection and begins hunger strike</u>

Plaintiff submitted two health service requests dated May 2, 2016, complaining of back pain, not being called to physical therapy and not receiving his cortisone injection or pain medication.  On May 4, 2016, defendant Thorne responded that the injection was scheduled and the other issues would be addressed in his upcoming physician appointment. Plaintiff's medication record states that an order for 60 tablets of Naproxen was filled on May 3, 2016.  Dkt. #47, exh. #1 at 83.  On May 4, 2016, defendant Whalen responded that a steroid injection was scheduled soon, but that staff could not divulge the exact date or time.

On May 6, 2016, plaintiff notified staff that he was on a hunger strike.  According to Dr. Syed, health services staff's main concern for an inmate on a hunger strike is dehydration and starvation ketosis, which occurs when the body has exhausted fat stores for energy and begins to break down muscle tissue for fuel.  This process can be dangerous

because tissues, organs and muscles start to break down. If starvation ketosis is left unchecked, a person loses lean muscle mass and organs can be damaged.

Also according to Dr. Syed, inmates on a hunger strike cannot safely receive cortisone or steroid injections because the cortisone can result in systemic effects, such as causing bleeding ulcers or metabolic acidosis, meaning the chemical balance of acids and bases in the blood is thrown off. When this happens, chemical reactions and processes in the body do not work right: respiration rate, heartbeat, cognitive function, digestion and metabolism can all be affected. Introducing medications into someone whose body has compromised systems may, at best, render the medication less effective, and may, at worst, cause additional damage.

When an appointment is cancelled because of a hunger strike, it is not rescheduled until the hunger strike has concluded because treating the patient's immediate health needs during a hunger strike takes precedence, particularly over non-emergency treatment options. When staff members learn the hunger strike has ended, the appointment is made as soon as possible.

On May 16, 2016, defendant Anderson went to plaintiff's cell to monitor his hunger strike, but plaintiff refused to get off his bed and come to the cell door. (It is unclear whether plaintiff had had any food since beginning his hunger strike.)

On May 23, 2016, defendant Dr. Syed saw plaintiff for a hunger strike wellness evaluation. Plaintiff reported that he was not getting his pain medication, and Dr. Syed renewed the order. Also on that day, plaintiff submitted a health services request about not

having received pain medication and having sleep problems caused by his back and shoulder pain. On May 25, defendant Anderson responded that a followup appointment had been scheduled with the doctor. On May 28, 2016, plaintiff complained of right shoulder pain and trouble sleeping and asked for medical treatment. Defendant Valerius responded that plaintiff's eating habits were increasing his pain and encouraged him to stop the hunger strike and begin eating and rehydrating. She also told plaintiff that he had upcoming appointments with a nurse and doctor.

3. <u>June 2016: plaintiff requests physical therapy, injection and medication and begins second hunger strike</u>

Plaintiff ended his hunger strike on June 3, 2016. Plaintiff's medication record shows that an order for 30 tablets of Naproxen was filled on June 4, 2016, but the medication was marked as "unavailable" on June 5, 6, 25, 26, 29 and 30, 2016. Dkt. #47, exh. #1 at 84, 89-90. (The parties do not explain what "unavailable" means but I assume that plaintiff did not have access to his medication on these days. Plaintiff does not present any evidence that any of the defendants caused the medication to be unavailable.)

Plaintiff saw defendant Anderson on June 17, 2016, and expressed anger about not having physical therapy, a cortisone injection or an order for pain medication. Anderson explained to plaintiff that (1) he was not able to participate in physical therapy because he was in disciplinary status at the time; (2) the physician determined that the injection could not be given because plaintiff was on a hunger strike at the time of the appointment; and (3) the physician would have to prescribe any additional medications. (The parties do not

explain whether plaintiff was asking for Naproxen or a different medication. In addition, plaintiff says that Anderson never explained anything to him and only intercepted his complaints, but the evidence he cites in support of his assertion does not discuss the in-person appointment he had with Anderson on June 17, 2016.) Anderson scheduled an appointment for plaintiff to see the doctor, whom plaintiff saw on June 20, 2016.

On June 21 and 26, 2016, defendant Anderson responded to three health services requests that plaintiff made about shoulder and back pain on June 17, 19 and 22, 2016, telling him that Dr. Syed had addressed his complaints during the June 20 appointment, that "prescribed interventions" were in place and the health services unit was waiting for plaintiff's medication to be delivered from the central pharmacy. Plaintiff initiated another hunger strike on June 20, 2016. Although plaintiff ate some food and drank some fluids at the emergency room on July 10, 2016 (plaintiff says he also ate and drank sporadically on other occasions), he did not completely end his hunger strike until August 11, 2016.

On June 24, 2016, plaintiff submitted a health services request stating that he was in extreme pain and nothing was being done to address his medical issues. Defendant DeYoung reviewed his medical records and determined that he was receiving appropriate care; that he had recently been seen by a provider, who had not ordered any changes; and that he was not helping himself because he was not compliant with his current medications or following the physical therapy plan of care. DeYoung responded to plaintiff on June 27, 2016, writing that he had been seen by the physical therapist (presumably in his cell), was offered an electrocardiogram that he refused and had a current prescription for Naproxen.

Plaintiff submitted two more health services requests on June 25, 2016, asking for his medication, additional medical treatment and the return of his medical slips. After the health services unit received the requests on June 28, defendant Newbury notified plaintiff that his medications would be on the unit as soon as they were delivered from the central pharmacy. On June 30, 2016, plaintiff submitted two more health service requests, complaining that his right shoulder and lower back were in pain and that he had not been seen or given any medication to address these issues. Plaintiff's medication record shows that Naproxen was available in early July 2016 and that plaintiff took it seven times between July 2 and 8, 2016.

On July 3, 2016, defendant Valerius responded to plaintiff's June 30 health service request, noting that plaintiff had seen a doctor on April 28, 2016, at which time Naproxen, a cortisone injection and physical therapy were ordered, but that his cortisone injection had to be rescheduled because it could not be administered in the midst of a hunger strike and his physical therapy could not be performed while he was in restrictive housing.

Inmates are moved to restrictive housing for disciplinary reasons, clinical observation placements, medical observation placement or transferred into temporary lock-up status pending the outcome of an investigation or a disciplinary hearing. According to Valerius, it is not feasible to provide physical therapy to an inmate who is in restrictive housing because the inmate cannot be moved out of segregation unless it is an emergency situation, and the provision of physical therapy is not considered an emergency. In addition, there is no appropriate facility in the restrictive housing unit for the physical therapist to administer

his treatment. (Plaintiff attempts to refute this with a July 25, 2016 progress note written by Dr. Hoechst, a physical therapist who evaluated plaintiff's shoulder while plaintiff was in handcuffs in his segregation cell. However, contrary to plaintiff's suggestion, the note does not show that he received physical therapy in restrictive housing. In fact, Dr. Hoechst wrote that he had seen plaintiff for six visits in early 2016 but that plaintiff had not been doing any of the prescribed exercises and that in-clinic therapy was not needed at that time. Plaintiff was told to do his own strengthening exercises and refrain from high-impact exercises that he had been doing in the recreation cage. Dkt. #58, exh. O.)

4. July 2016: physical therapy and hunger strike evaluations

On July 6, 2016, plaintiff submitted two health services requests asking for medical attention for his right shoulder and low back pain. Defendant Valerius told plaintiff on July 9 that he had a doctor's appointment scheduled and encouraged him to take the Naproxen as ordered to help with the pain. An order for 29 Naproxen pills was filled on July 11, 2016.

Dr. Syed saw plaintiff on July 21, 2016 for a hunger strike evaluation. During this appointment, plaintiff requested a magnetic resonance imaging study, which according to Dr. Syed, is useful if there is a soft tissue injury that results in a torn ligament or a bulging disc in the back. Because plaintiff provided no history of a fall or any other trauma and denied any range of motion problems and Dr. Syed's examination of plaintiff did not discose any problems, Dr. Syed determined there was no "clinical indication" for the study. Rather, he referred plaintiff to physical therapy to address his shoulder pain. Dr. Syed believed

physical therapy was a preferred course of treatment because the physical therapist can teach proper strength and flexibility exercises that can be completed in a cell.

On July 25, 2016, plaintiff received an initial physical therapy evaluation during which he claimed that his right shoulder pain was "worse than before." (Defendants point to the therapist's progress notes stating plaintiff admitted not doing physical therapy exercises and had been observed doing pushups and burpees (squat thrusts, according to Wikipedia) in recreation the week prior. Plaintiff says that the therapist lied in his notes.) The physical therapist discharged plaintiff from treatment, noting that plaintiff did not require in-clinic therapy and encouraged him to complete strengthening exercises on his own.

On July 24, 2016, plaintiff submitted a health services request stating that he tore something in his shoulder, broke a bone or had a pinched nerve causing tingling down his arm and into his finger. Defendant Newbury responded on July 26, 2016, assuring plaintiff that the doctor was following his concerns. On July 28, 2016, Newbury responded to another request from plaintiff, who complained of a lack of medical treatment for his right shoulder, which was still in pain. Newbury responded that both the doctor and physical therapist had recently seen him to address these concerns.

5. August 2016: plaintiff requests missing medication and injection

On August 2, 2016, plaintiff submitted a health services request about his right shoulder and low back pain. Defendant DeYoung told plaintiff on August 4 that he had an upcoming appointment with the doctor. Plaintiff submitted two more health services

requests on August 7 and 8, complaining about not receiving the cortisone injection, physical therapy or pain medications for his right shoulder pain. On August 10, defendant Thorne responded that plaintiff was scheduled to see the doctor and that his meals were being monitored.

On August 9, 2016, plaintiff submitted a health services request, complaining that his medication was being withheld. Anderson responded on August 11 that the medication prescriptions were entered, but that, as plaintiff had been told previously, there is sometimes a delay between when the order is entered and when the medications arrive from the central pharmacy.

On August 11, 2016, defendant Dr. Syed saw plaintiff for a hunger strike assessment and did not note any complaints about missing medications. Because plaintiff said that he was eating, Syed discontinued the hunger strike evaluations. He also ordered the cortisone injection, and defendant Newbury scheduled it for September 16, 2016, the earliest available appointment.

Also on August 11, 2016, plaintiff submitted a health services request asking about his x-ray, other "ordered treatments" (he did not specify which ones) and asking when he would get refills of his "Maylax" and Naproxen. Defendant Thorne responded on August 15 that the x-ray and cortisone injection were both scheduled, a 30-day supply of Naproxen had been sent on August 1, 2016 and the Miralex would be refilled. Plaintiff submitted two more health services requests on August 14, complaining about pain in his back and shoulder from sleeping on the floor, stating that he needed an extra mattress and asking about his

medication refills. Defendant Anderson responded on August 16 that medical staff were addressing his concerns.

On August 25, 2016, shortly after defendant Walters began working at Columbia, she received a health services request from plaintiff dated August 23, in which he complained of shoulder and low back pain. Walters asked her supervisor how to respond in light of the fact that there was an appointment scheduled. Walters was told to tell plaintiff that he had a right shoulder cortisone injection scheduled, but not to disclose the date.

6. September 2016: plaintiff refuses cortisone injection

On September 4 and 5, 2016 plaintiff submitted health services requests complaining about pain in his right shoulder and accusing staff of not providing him any medical treatment (particularly a cortisone injection) and lying to him. Defendant Thorne responded on September 8 that plaintiff had been seen recently by the doctor and confirmed that a cortisone injection was scheduled. She also told him that a doctor is not on site five days a week and that he had to be patient.

On September 8, 2016, plaintiff submitted a health services request about right shoulder and low-back pain. Defendant Valerius responded on September 10, that a doctor's appointment was scheduled that week, including a cortisone injection.

Plaintiff refused his cortisone injection on September 16, 2016, stating that there was no fluoroscopy (x-ray imaging) and the injection would take place in an unsterile segregation cell that he thought was inappropriate for a medical procedure. According to Dr. Syed,

cortisone injections are administered by the prison physician either in the health services unit or the inmate's housing unit, and both locations are medically acceptable clinical settings. (Plaintiff cites Department of Adult Institution Policy 500.10.08, which states that health care procedures must be conducted in an "appropriate clinical setting," but plaintiff does not present any evidence refuting Dr. Syed's medical assessment that the housing unit is not a clinically appropriate setting for a cortisone injection.)

On September 19, 2016, defendant Gohde, the health services unit manager, received a September 15 interview and information request from plaintiff about not receiving his cortisone injection and Anderson's change of the doctor's orders regarding his Naproxen prescription from once a day at night to once a day in the morning. Also on September 19, defendant Valerius forwarded to Gohde health service requests that she had received from plaintiff about pain and the lack of a cortisone injection on September 15 and 25, 2016. Gohde noted that plaintiff had refused the cortisone injection that had been scheduled a few days earlier.

On September 21, 2016, defendant Anderson responded to plaintiff's September 18 health service request about not receiving care by pointing out that plaintiff had been seen 29 times in the previous six months, had been offered and refused a cortisone injection and had been offered physical therapy but he was not interested in doing the in-cell exercises. She encouraged plaintiff to comply with his treatment plan because it was the only way for him to see improvement.

7. October 2016

Plaintiff submitted several health service requests complaining about continuing pain and not receiving a cortisone injection:

- October 2, 2016: plaintiff complains that Naproxen is not helping his shoulder pain. Defendant Thorne scheduled plaintiff to see a nurse.

- October 6, 2016: plaintiff complains about not being given physical therapy and his medication not working. Defendant Anderson responded on October 10 that these issues would be discussed at his upcoming nursing appointment. (For security reasons, Anderson could not tell plaintiff that the appointment had been scheduled for October 14, 2016.)

- October 9, 2016: plaintiff complains that Naproxen is not helping his shoulder pain. On October 12, 2016, defendant Thorne responded that plaintiff was on the sick call that day.

- October 9, 2016: plaintiff submits two forms stating he is on a hunger strike. Defendant Thorne responded that plaintiff was placed on meal monitoring. Defendant Walters responded that he would be monitored for not eating his regularly scheduled meals.

- October 11, 2016: plaintiff asks for cortisone injection, but states that he will refuse it if it is administered in the due process room of his housing unit. The request is forwarded to Gohde for a response.

Defendant Walters saw plaintiff on October 14 to address his previous complaints. Plaintiff reported that he would accept the injection even if it was given in his housing unit, so the appointment was scheduled. Walters warned plaintiff about the danger of a hunger strike.

On October 18, 2016, plaintiff complained that the Naproxen was not helping his pain and was hurting his stomach. Defendant Valerius responded on October 22 that he should not take the Naproxen if he was not eating and that the injection had been rescheduled. In

a second health services request on October 18, plaintiff asked when he would start physical therapy. Valerius responded on October 22 that he had been evaluated by the physical therapist who recommended an in-cell exercise program. On October 20, plaintiff submitted a health service request stating that he was on another hunger strike because staff were lying about physical therapy and the cortisone injection. Valerius responded on October 22 that plaintiff had refused an injection in September and discussed the injection at his appointment on October 14.

On October 24, 2016, plaintiff submitted a health service request with comments like "watch what's next" and "wanna play." Defendant Gohde referred plaintiff to the psychiatrist and scheduled him for medical evaluation. In an October 30 information and interview request, plaintiff again expressed his concerns to Gohde about not receiving treatment. Gohde reviewed plaintiff's medical records and learned he had received physical therapy in March and April 2016, before he was transferred to temporary lock-up, and had an evaluation on July 25, 2016.

8. November 2016

On November 2, 2016, Gohde sent plaintiff a memo confirming she had received several health service requests from him between September 19, 2016 and October 13, 2016, and that even though plaintiff had refused the steroid injection offered on September 16, 2016, another would be scheduled based on his October 14, 2016 appointment. She also stated that plaintiff would continue to be seen in the restrictive housing unit for his medical

appointments and blood draws.  This included any future cortisone injections, so long as plaintiff was assigned to restrictive housing.

On November 16, 2016, plaintiff asked what was going on with his different appointments, and Valerius informed him on November 19 that the cortisone injection was scheduled but would not be given until after the first week of December because there was no doctor until then.  Plaintiff submitted a similar health service request on November 21, and Anderson responded on November 22 that the injection was scheduled.

9.  December 2016

On December 6, 2016, plaintiff complained about a lack of medical care because he had not been given his cortisone injection.  On December 9, 2016, Dr. Springs gave plaintiff a steroid injection and ordered an x-ray and pain-relieving gel.  Anderson responded on December 12 that the cortisone shot had been given.

On December 28, 2016, defendant Whalen responded to plaintiff's December 25 health services request in which he complained that his right shoulder was in pain and he needed to be seen and evaluated.  Whalen responded that a sick call appointment was scheduled and plaintiff was seen on December 30, 2016.  At the December 30, 2016 appointment, Nurse Young (not a defendant) saw plaintiff and instructed him to continue his range of motion exercises and to take his Naproxen.

10. <u>Janaury 2017</u>

Valerius received a health services request from plaintiff dated January 3, 2017, in which plaintiff stated that his right shoulder was in pain, he had trouble sleeping and his fingers went numb daily. Valerius responded on January 8, 2017, that plaintiff had been seen by Dr. Springs on December 9, 2016, who determined that an imaging study was not necessary, and by Nurse Young on December 30, 2016. Valerius instructed plaintiff to continue with his range of motion exercises, told him to take his Naproxen and Voltaren gel and scheduled him for a follow-up appointment with the doctor. In response to similar complaints from plaintiff on January 16, 2017, Valerius repeated what she had told plaintiff on January 8.

On January 25, 2017, plaintiff met with the physical therapist, who noted the following in plaintiff's chart:

> Pt has been evaluated by this same therapist on several occasions (March 2016, July 2016), and by another DOC therapist on April 2015. Overall, had 12 sessions of PT all for the right shoulder… Pt in no visible distress and was cuffed in front. He denies any activity, denies attending rec and stopped all shoulder exe[r]cises due to pain. When questioned, he did admit that in July 2016 he was doing pushups, burpees and other high impact exercises in DS1. Pt is leaving DOC in five months. He continues to push for an MRI… Pt was informed that MD Springs did not order an MRI. He did receive [a cortisone] injection in Dec. 2016, which "didn't do shit." Overall, therapy can once again offer him exercises to perform in his room…[H]e was ultimately informed that he would greatly benefit from modified exercise on the shoulder. He has stopped any/all exercise. This will lead to atrophy and reduced [range of motion]…I don't expect much progress due to his past presentations and his unwillingness to perform any self-directed exercises.

(Plaintiff says the physical therapist was lying, but it does not matter for the purposes of plaintiff's claims whether the contents of the progress note are true. What is relevant is that

defendants were provided this information and relied on it in responding to plaintiff's health services requests for physical therapy.)

Plaintiff submitted another health services request dated January 29, 2017, complaining that he had been taken off the sick call list and still had not been seen by medical staff. Thorne responded that plaintiff was on the physician list for February 6, but reminded him that appointments are subject to change, particularly because segregation appointments are extremely limited (once per week in DS-1 and once per week in DS-2). Plaintiff did not see the doctor until February 20, 2017.

11. <u>February to May 2017: plaintiff receives physical therapy and imaging study and is released from prison</u>

Plaintiff did not make any health services requests related to his back or shoulder in February 2017 or anytime afterwards. On February 10, 2017, in the interview room of disciplinary separation, plaintiff met with the physical therapist, who provided an ice bag for him to use twice daily and a sheet demonstrating appropriate exercises. On February 20, 2017, Dr. Syed saw plaintiff and asked whether plaintiff had completed physical therapy and noted a cortisone injection had been scheduled for September 2016. Dr. Syed determined that the best course of action was to refer plaintiff to physical therapy for a comprehensive evaluation after plaintiff was out of restrictive status. Plaintiff's Naproxen order also was discontinued in February 2017.

On March 8, 2017, a physical therapist provided a Theraband to assist plaintiff with strengthening and range of motion exercises but discontinued plaintiff's therapy.

On April 17, 2017, plaintiff saw an advanced practice nurse practitioner and reported that physical therapy had not been helpful because he was in segregation. He also stated that he had fallen in the shower after his surgery in 2014. Relying on that information, the practitioner completed a request for prior authorization for a non-urgent care form to see whether plaintiff could be approved for a magnetic resonance imaging study as an outpatient because he was leaving the institution in thirty days. The study was performed on May 9, 2017 and revealed degenerative tearing of the labrum in plaintiff's right shoulder. Plaintiff was seen by the University of Wisconsin Hospital orthopedics department on May 12, just before his release from prison on May 16, 2017.

OPINION

A. Legal Standards

Plaintiff contends that defendants were deliberately indifferent to his back and shoulder problems. To prevail on a claim under the Eighth Amendment, a prisoner must show that the defendant was "deliberately indifferent" to a "serious medical need." Estelle v. Gamble, 429 U.S. 97, 104-05 (1976). A "serious medical need" may be a condition that a doctor has recognized as needing treatment or one for which the necessity of treatment would be obvious to a lay person. Johnson v. Snyder, 444 F.3d 579, 584-85 (7th Cir. 2006). The condition does not have to be life threatening. Id. A medical need may be serious if it "significantly affects an individual's daily activities," Gutierrez v. Peters, 111 F.3d 1364, 1373 (7th Cir. 1997), if it causes significant pain, Cooper v. Casey, 97 F.3d 914, 916-17 (7th Cir. 1996), or

if it otherwise subjects the prisoner to a substantial risk of serious harm, <u>Farmer v. Brennan</u>, 511 U.S. 825 (1994).  Defendants do not argue that plaintiff's back and shoulder problems fail to meet this standard, and a reasonable jury could conclude from the record that plaintiff had a serious medical need.

"Deliberate indifference" means that the officials are aware that the prisoner needs medical treatment, but are disregarding the risk by failing to take reasonable measures.  <u>Forbes v. Edgar</u>, 112 F.3d 262, 266 (7th Cir. 1997).  In applying the deliberate indifference standard, "[a] medical professional is entitled to deference in treatment decisions unless no minimally competent professional would have so responded under those circumstances."  <u>Roe v. Elyea</u>, 631 F.3d 843, 857 (7th Cir. 2011) (quoting <u>Sain v. Wood</u>, 512 F.3d 886, 894-95 (7th Cir. 2008)).  "A medical professional acting in his professional capacity may be held to have displayed deliberate indifference only if the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible did not actually base the decision on such a judgment."  <u>Id.</u>

## B.  <u>Plaintiff's Claims</u>

From the allegations in his complaint and the arguments in his brief in response to defendants' motion for summary judgment, I understand plaintiff to be alleging that defendants either refused to provide him treatment or delayed prescribed treatment for his shoulder and low back pain in the following ways:

1. Plaintiff did not receive the cortisone injection that Dr. Syed ordered in April 2016 until December 9, 2016, even though he wrote numerous health services

requests asking about it. He blames Dr. Syed and the nursing staff (he does not identify any individual nurse defendants) for not following through on his order.

2. Plaintiff asked for a magnetic resonance imaging study on several occasions, but Dr. Syed did not order one. A different provider ordered a magnetic resonance imaging study on May 9, 2017 that showed that plaintiff had degenerative tearing of the labrum.

3. Plaintiff was not provided the physical therapy that Dr. Syed ordered in April 2016.

4. Plaintiff did not have his Naproxen pain medication at various times in May, June and August 2016.

Plaintiff presents very little evidence to support his contention that these delays or denials of treatment amounted to deliberate indifference. He refers primarily to health service request forms he submitted and his own conclusory opinions about what conclusions defendants should have reached and how the medical evidence should be interpreted. The Court of Appeals for the Seventh Circuit has made clear that "[c]onclusory allegations that have no factual support are insufficient to create a genuine issue of material fact." Powers v. Dole, 782 F.2d 689, 695 (7th Cir. 1986). As explained in the screening order, to prevail on his claims, plaintiff must present specific evidence showing that defendants did not have adequate medical justification for their treatment decisions. It is not enough for plaintiff to show that he disagrees with defendants' conclusions about the appropriate treatment, Norfleet v. Webster, 439 F.3d 392, 396 (7th Cir. 2006), that other medical providers reached a different conclusion about what treatment to provide plaintiff, Pyles v. Fahim, 771 F.3d 403, 409 (7th Cir. 2014), or even that defendants could have provided better treatment. Lee v. Young, 533 F.3d 505, 511-12 (7th Cir. 2008). Rather, plaintiff must show that any medical

judgment by defendants was "so significant a departure from accepted professional standards or practices that it calls into question whether the doctor actually was exercising his professional judgment." Pyles, 771 F.3d at 409.

In addition, plaintiff must show how each individual defendant was responsible for plaintiff's failure to receive treatment. In most instances, plaintiff does not make clear whether a particular defendant was to blame for a failure to provide treatment or whether any defendant could have done anything differently. For example, plaintiff alleges that several of the nurse defendants informed him on different occasions that medication was ordered or an appointment was scheduled, but he did not receive the medication or appointment. However, as long as a defendant honestly believed that plaintiff was receiving appropriate treatment or that the defendant was making good faith efforts to provide treatment, that defendant cannot be held liable under the Eighth Amendment. Gruenberg v. Gempeler, 697 F.3d 573, 579 (7th Cir. 2012) ("inadvertence or error in good faith" does not violate Eighth Amendment). I will discuss each of plaintiff's claims separately.


A. Cortisone Injection

Plaintiff criticizes defendants for not giving him a cortisone injection for his right shoulder pain until December 9, 2016, more than seven months after Dr. Syed ordered it on April 28, 2016. However, plaintiff fails to offer any evidence showing that any of the defendants intentionally delayed the injection or could have scheduled it sooner but failed to do so.

The undisputed facts show that as early as May 2, 2016, plaintiff began submitting health services requests complaining about not receiving his injection. However, it is undisputed that a cortisone injection must be administered by a physician and that more urgent demands on the physician may take precedence over procedures like a cortisone injection, limiting the times when the procedure can be scheduled. The record shows that the prescription for a cortisone injection was part of an overall treatment plan for plaintiff, and plaintiff has not identified any evidence suggesting that the injection was needed at a specific time or that it should have taken precedence over other demands on the physician at the prison. Petties v. Carter, 836 F.3d 722, 728 (7th Cir. 2016) ("[W]e look at the totality of an inmate's medical care when considering whether that care evidences deliberate indifference to serious medical needs."); Jackson v. Pollion, 733 F.3d 786, 790 (7th Cir. 2013) ("In cases where prison officials delayed rather than denied medical assistance to an inmate, courts have required the plaintiff to offer 'verifying medical evidence' that the delay (rather than the inmate's underlying condition) caused some degree of harm."); Langston v. Peters, 100 F.3d 1235, 1240 (7th Cir. 1996) (guard not liable for deliberate indifference if there was no "detrimental effect" from guard's refusal to obtain care for inmate). Moreover, between May 9 and June 3, 2016, plaintiff was on a hunger strike, which Dr. Syed determined prevented plaintiff from receiving an injection. Plaintiff has not identified any basis on which to challenge Dr. Syed's medical opinion that a cortisone injection is not safe for someone on a hunger strike.

After his hunger strike ended, plaintiff complained to defendant Anderson at a nurse visit on June 17, 2016 that he had not received an injection or other treatment, and Anderson scheduled him to see a doctor on June 20, 2016 so these complaints could be addressed. However, on June 20, 2016, plaintiff began another hunger strike that he continued off and on until August 11, 2016.

On August 11, 2016, Dr. Syed saw plaintiff and again ordered the injection, which was scheduled for the earliest time available—September 16, 2016. However, plaintiff refused to let Dr. Spring give him the injection on September 16 because it was going to be given in the housing unit without a fluroscopy. Dr. Spring is not a defendant in this case, but even so, plaintiff has not presented any evidence to challenge either Dr. Spring's judgment that a fluroscopy was not required or Dr. Syed's medical opinion that the housing unit is a clinically appropriate environment for such injections.

Plaintiff began another hunger strike on October 9, 2016. On October 14, 2016, plaintiff told defendant Walters that he would accept an injection even if it were given in the housing unit, but he began another hunger strike only six days later, on October 20, 2016, further delaying his opportunity for an injection. Nonetheless, nursing staff forwarded plaintiff's request for an injection to defendant Gohde, who arranged in early November 2016 for the injection to be scheduled for December 9, 2016, when plaintiff finally received it.

Although plaintiff blames defendants for not insuring that he received the cortisone injection sooner, the undisputed facts show that plaintiff's own actions prevented him from receiving the injection and that defendants responded in a timely manner to schedule the

injection when it was safe for plaintiff to receive it.  Accordingly, plaintiff has failed to show that any of the defendants acted with deliberate indifference in failing to provide him a cortisone injection.

### B. Magnetic Resonance Imaging Study

Plaintiff contends that he should have received a magnetic resonance imaging study well before May 2017.  However, the nurse and health services manager defendants have no authority to order such a test, and plaintiff has presented no evidence showing that Dr. Syed acted with deliberate indifference in failing to grant plaintiff's requests for it.  In Dr. Syed's opinion, the scan was not required because plaintiff denied having range of motion problems and had not reported a history of soft tissue injury (such as a fall or other trauma) that would have resulted in a torn ligament or a bulging disc.  Although plaintiff points out that another provider later referred him for a magnetic resonance imaging study on his shoulder, in part because he had told her that he fell in the shower after his shoulder surgery in 2014, he has not produced any evidence showing that Dr. Syed knew about this fall or that his decision not to order the scan  was a substantial departure from accepted professional judgment, practice or standards.  At most, plaintiff has shown differing medical opinions among his health care providers, which is not enough to establish deliberate indifference.

## C.  Physical Therapy

Plaintiff alleges that defendants failed to provide him the physical therapy that he was supposed to receive.  However, as with the cortisone injection, plaintiff fails to show that any of the defendants could have scheduled him for physical therapy sooner but failed to do so or had any control over what kind of therapy he was given.

The undisputed facts show that defendants understood from the physical therapy notes in plaintiff's medical record that he had received some physical therapy in early 2016 and was given in-cell exercises to do but he did not do them.  In addition, it is undisputed that physical therapy is not provided to inmates, like plaintiff, who are in restrictive housing because they cannot be moved out of segregation unless it is an emergency situation, and the provision of physical therapy is not considered an emergency.  The physical therapist who evaluated plaintiff on July 25, 2016 determined that he did not require in-clinic therapy, encouraged plaintiff to complete strengthening exercises on his own and discharged plaintiff from treatment.  Plaintiff has not presented any evidence showing that Dr. Syed or any of the other defendants had the authority to override this decision or could have done more to provide plaintiff physical therapy at that time.

On January 25, 2017, plaintiff again met with a physical therapist, who noted that plaintiff had not been compliant with his in-cell exercises, that he had been performing vigorous exercises and that there was not much else that would help plaintiff from a physical therapy standpoint.  Although plaintiff says the contents of the physical therapy progress note are not true, he has not shown that any of the defendants knew that to be the case.  In fact,

many of the nurse defendants relied on the physical therapy notes to explain to plaintiff why he was not receiving regular physical therapy. Plaintiff also saw the physical therapist two more times before he was released from prison—in February and March 2016. Accordingly, plaintiff has failed to show that any of the defendants acted with deliberate indifference in failing to provide him physical therapy.

### D.  Pain Medication

Plaintiff generally complains about not receiving his pain medication, but the evidence he presents is limited to health services requests that he submitted on May 2, May 23, June 3, June 17, June 19, June 22, June 24-25, June 30, August 7-9, August 11 and August 14, 2016 about not having pain medication. Although plaintiff blames defendants for not making sure that he received the medication, he has failed to adduce any evidence that any of the defendants deliberately delayed the distribution of his pain medication. Burton v. Downey, 805 F.3d 776, 785 (7th Cir. 2015) ("[W]ithout evidence that defendants acted with the requisite bad intent in delaying the dispensation of his medication, Burton's allegations are insufficient to sustain a deliberate indifference claim.").

The record shows that Dr. Syed ordered Naproxen for plaintiff on April 28, 2016, and that plaintiff complained on May 2, 2016 that he had not yet received the medication. However, an order for 60 tablets of Naproxen was filled the next day, on May 3, 2016. On May 23, plaintiff complained that he was not getting his medication, but Dr. Syed renewed the order for Naproxen that same day.

Plaintiff's medication record shows that an order for 30 tablets of Naproxen was refilled on June 4, 2016, but the medication record suggests that it was not available to plaintiff on June 5, 6, 25, 26, 29 and 30, 2016. Plaintiff complained about not having medication in a visit with defendant Anderson on June 17 and in health service requests dated June 17, 19, 22, 24-25 and 30. However, Anderson arranged for him to see the doctor on June 20, 2016, and informed him on June 21 and 26, 2016 that the medication was on order and medical staff were waiting for it to be delivered from the central pharmacy. Defendant Newbury also informed plaintiff on June 28, 2016 that health services was still waiting for the delivery from central pharmacy. Records show that plaintiff had his medication and took it at least as early as July 2, 2016. Another refill was delivered on July 11, 2016.

A similar problem occurred in August 2016. Plaintiff complained in health service requests dated August 7, 8, 9 and 11, 2016 that he was not receiving his medication. However, defendant Anderson responded on August 11 and defendant Thorne responded on August 15 that a 30-day supply had been ordered on August 1, 2016, but there was a delay in receiving it from the central pharmacy.

Although plaintiff apparently had to wait for short periods in June and August 2016 while his medication was being delivered from the central pharmacy, he has not presented evidence showing that any of the defendants were responsible for the delay or could have done anything to address it. Additionally, there is no evidence to suggest that defendants were aware at the time that it would take the central pharmacy longer than a few days to fill the request. Further, even if any of the defendants made a mistake by failing to order the

medication in a timely manner or by not arranging for its prompt delivery, numerous courts have found that an "isolated mistake does not allow a plausible inference of deliberate indifference." Robbins v. Waupun Correctional Institution, 2016 WL 5921822, at *3 (E.D. Wis. Oct. 11, 2016) (collecting cases).

In sum, there are no material facts in dispute with respect to any of plaintiff's claims and no reasonable jury could conclude from the undisputed facts that defendants acted with deliberate indifference with respect to providing plaintiff with a cortisone injection, physical therapy, a magnetic resonance imaging study or pain medication. Accordingly, defendants are entitled to summary judgment with respect to plaintiff's Eighth Amendment claims against them.

ORDER

IT IS ORDERED that:

1.  Plaintiff Donta Jenkins's motion to dismiss defendants' motion for summary judgment, dkt. #66, is DENIED.

2.  Plaintiff's motion to add video and medical images to the record, dkt. #69, is GRANTED.

3.  Defendants' motion for summary judgment, dkt. #44, is GRANTED.  The clerk of court is directed to enter judgment in favor of defendants Salam Syed, Trisha Anderson, Kristine Deyoung, Melissa Thorne, Denise Valerius, Kerry Newbury, Jamie Gohde, Kathleen Whalen, Neaver Walters and Candace Warner and close this case.

Entered this 8th day of November, 2018.

BY THE COURT:

/s/

_____

BARBARA B. CRABB
District Judge